# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF   NEW YORK

Sport-BLX, Inc., individually and derivatively on behalf of its
shareholders,

Plaintiff(s),

-against-

Michael M. Salerno, Northeast Professional
Planning Group, Inc., Cypress Holdings, III, LP,
John and Jane Does 1-4; and XYZ Corps. 1-4.

Defendant(s).

Index No.

𝕾𝖚𝖒𝖒𝖔𝖓𝖘

Date Index No. Purchased:   August 3, 2022

To the above named Defendant(s)

Michael M. Salerno, Northeast Professional Planning Group, Inc., Cypress Holdings,
III, LP, John and Jane Does 1-4; and XYZ Corps. 1-4.

You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

The basis of venue is   a substantial part of the events & omissions giving rise to the claims were in NY Cty
which is   , because inter alii Sport-BLX's primary place of business was in NY Cty, making venue proper under CPLR 503(a).

Dated:   Ridgewood (Queens), NY

August 3, 2022

Cohen&Green P.L.L.C.

by____/s/ Remy Green_____

Remy Green

**Attorneys for Plaintiff**

COHEN&GREEN P.L.L.C.
1639 Centre St., Suite 216
Ridgewood, New York 11385

t:  (929) 888-9480
f:  (929) 888-9457
e:  remy@femmelaw.com

Case 1:22-cv-08111-LGS   Document 6-1   Filed 10/04/22   Page 3 of 26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Sport-BLX, Inc., *individually and derivatively on behalf of its shareholders*,

Index No. _____

*Plaintiffs,*

**VERIFIED COMPLAINT**

- against -

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Michael M. Salerno, Northeast Professional Planning Group, Inc., Cypress Holdings, III, LP, John and Jane Does 1-4; and XYZ Corps. 1-4.

*Defendants.*

Plaintiff, Sport-BLX, Inc, by its attorneys, Cohen&Green PLLC and Wylie Stecklow PLLC, hereby complains of Defendants, upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1.      This case concerns a grave breach of fiduciary oblgiations.

2.      Plaintiff Sport-BLX is a small start-up built on a great idea. It could have revolutionized a field.

3.      Sport-BLX planned to create a platform that allowed sports fans to own their passion, and in turn, provide investments that allow better access to various high-investment athletics. *See, e.g.,* Stephanie Dhue, *Owning a racehorse in the Belmont Stakes is more attainable as fractional ownership platforms grow*, CNBC (Jun. 5, 2021).

4.      Once a Board Member at Sport-BLX, Michael Salerno has spent the past few years throwing every bit of sand he can find in the gears of the company.

5.      It is an understatement to say that investments of this kind involve a dense regulatory thicket.

6.      Yet, even as he sat on the Board, Salerno and his fellow Defendants stood in the way of regulatory approvals, trying to use their hold-out status to shake down Sport-BLX for millions of dollars.

7.      And ultimately, even after being removed from the Board, Salerno succeeded: Sport-BLX's multi-million dollar promise has largely been dashed on the rocks.

8.      If fiduciary duties mean nothing else, they surely must mean a fiduciary may not extort his beneficiaries over petty personal grievances.

9.      So this suit follows, seeking to hold Salerno and his fellow Defendants accountable for the obvious and serious financial harm they have selfishly and irrationally caused their fellow investors in Sport-BLX.

## PARTIES AND JURISDICTION

10.     Plaintiff Sport-BLX, Inc. is a Delaware corporation, with, at all relevant times, its principal place of business at 510 Madison Avenue, 9th Floor, New York, New York, 10022.

11.     Defendant Cypress Holdings, III, LP is a Delaware limited partnership, with its principal place of business located at 494 Sycamore Avenue, Shrewsbury, New Jersey.

12.     Defendant Michael M. Salerno is the manager of Cypress Holdings, III, LP.  He is also a former board member of Defendant and Third Party Plaintiff Sport-BLX.

13.     As a board member — and later as a former board member — Salerno owed various duties to Sport-BLX and its shareholders.

14.     Defendant Northeast Professional Planning Group, Inc. ("NPPG") is, upon information and belief, a New Jersey domestic partnership formed in 1995, whose founder and CEO is Defendant Salerno.

15.     Defendants John and Jane Does 1-4 and XYZ Corps. 1-4 (the "Doe Owners") are fictitious entities, unknown to Plaintiffs, who constitute the owners and shareholders of Defendant

Cypress.

16.     Upon information and belief, the Doe Owners have approved and personally fully participated in all the conduct of Cypress alleged below.[1]

17.     Plaintiffs have been damaged in a sum that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction

18.     Venue is properly laid in the Supreme Court of the State of New York, County of New York, including because Plaintiffs' claims arose there.

## RELEVANT FACTS

19.     Sport-BLX was conceived of and founded by Hall and De Perio.

20.     It is an attempt to bring a unique concept and model to the market: the company's platform allows sports fans to locate athletes, teams, or racehorse owners willing to sell a certain percentage of on-field earnings or equity, reviewing and researching the offering structure, and purchasing those shares of offering.

21.     Or put more simply, Sport-BLX lets fans and investors invest in sports.

22.     Until Salerno's actions detailed below, Sport-BLX was awash in positive press and buzz. The company was set to take the sports investment world by storm.

23.     Some of that just makes sense: sports fans love their teams, and since at least the days of Ancient Rome, lined up to show their support in every possible way.

24.     Sport-BLX built a platform and model that monetized that directly. And but for the actions of Salerno and his fellow Defendants, that project likely would have succeeded in spades.

***After an Invitation To Invest, Salerno Drags His Feet and Forces Sport-BLX to Take His Investment.***

---

[1] To the extent any individual Doe or XYZ Corp. did not participate, Plaintiff will drop them as Defendants upon receipt of an affidavit to that effect.

3

25.    In or around December 2018, Salerno first expressed interest to Hall in becoming an investor in the project.

26.    In and around that time, Sport-BLX was in its "founder's round" of investment.

27.    Over the days and weeks between December 2018 and February 2019, Salerno attended a number of meetings with Hall and/or De Perio, and Henry Sullivan discussing various aspects of the business.

28.    In February 2019, DePerio transmitted diligence materials to Salerno.

29.    Upon information and belief, Salerno in fact reviewed them.

30.    Subsequent substantive email communication confirms that Salerno reviewed those diligence materials.

31.    In fact, Salerno's review is evident because on February 28, 2019, Salerno sent an email commenting in great detail on about the information included in the diligence materials.

32.    In that same email, Salerno stated: "we are good with majority of your responses as is … and [i]f [a pair of changes Salerno made] are acceptable we can execute and fund asap."

33.    De Perio responded, accepting Salerno's changes and agreeing to the contract.

34.    Along with the contract, the parties also executed a "Stock Purchase Agreement" and a "Side Letter," which provided, among other things, that upon making the investments, Cypress (defined in that contract as "Salerno") would be entitled to a Board seat.

35.    Pursuant to the Purchase Agreement, funding for the investment was immediately due and payable to Sport-BLX.

36.    However, Salerno did not make the investment — and did not respond to calls and texts about the investment.

37.    Upon information and belief, Salerno failed to respond because he was (put

4

colloquially) keeping his options open.

38.     Upon further, information and belief, Salerno had received information about a pending opportunutiy for the company that, although was pitched to him as a sure thing, was in reality a longshot and did not ever materialize.

39.     Thus, on March 18, De Perio reached out and stated: "At this point, too much has changed since our closing dinner and exchange of executed docs last Thursday. I would not be a proper fiduciary to our founders investors and pre-series a investors who have funded simultaneous with the execution of docs as stated, if we accepted the investment on Monday or thereafter (obviously I don't know your intent)."

40.     Hall then spoke to Salerno on the phone on March 9 confirming the investment offer was being withdrawn.

41.     On or around March 11, despite the confirmation that the offer was withdrawn, Salerno wired $1,000,000 to the appropriate Sport-BLX bank account as set out in the withdrawn offer.

42.     Since the executed and withdrawn agreement had no in-built time limit, Hall, De Perio, and Sport-BLX made the judgment they had no choice but to accept this  investment — despite serious misgivings about Salerno's good faith.

***Salerno Begins to Thwart the Sport-BLX Business Plan.***

43.     The goal of those contracts, put simply, was to make it so Sport-BLX could act on that business model.  As Defendants themselves put it:

   a.   "Sport-BLX was formulated by Hall and DePerio (collectively, the "Founders") in an effort to create a 'new economy' in sports. Towards this end, the Founders seek to 'tokenize' sport assets, such as racehorses and professional athlete[ contracts], dividing such assets into tradeable, fungible units to be purchased and traded by

fans and investors";

    b.  "In this regard, the stated mission of Sport-BLX is to create a block chain platform to improve the dynamics of investing in sport assets"; and

    c.  "[T]he SportBLX platform would improve the dynamics of investing in sport assets through lower minimums, lower fees, and greater transparency."

Dkt. No. 16 ¶¶ 16-17; 20, *Cypress v. Hall et al*., 22-cv-01243 (SDNY).

44.    The business plan all the investors relied upon would have been successful and extraordinarily profitable — and for that matter, Defendants themselves have claimed that the fact Sport-BLX did not ultimately follow the initial business plan resulted in damages to the tune of millions of dollars. *See generally*, *id.*

45.    The difference is that Defendants have placed the blame in the wrong place: Defendants failure to provide the FINRA-required disclosures was the but-for cause of Sport-BLX needing to abandon the initial, and conceded-to-be-profitable, business plan.

46.    Almost immediately upon making the initial investment and before his first board meeting, Salerno — and acting by and through Defendant NPPG —began to make frivolous and harassing claims about the business plan he had agreed to and forced his way into as well as making absurd books and records demands for information that did not in fact exist.

47.    It was apparent that Salerno believed the blockbuster transaction, as discussed in ¶ 38 had happened

48.    But in reality it didn't.

49.    This was a small company with an incredible idea.  The founders worked tirelessly to execute the plan with haste on limited budget.

50.    Yet Salerno — along with the other Defendants — decided he could treat the company as though it were a major corporation with armies of lawyers and accountants available

Case 1:22-cv-08111-LGS   Document 6-1   Filed 10/04/22   Page 9 of 26

to answer his every question, despite how irrelevant — and in many cases imaginary — they were.

51.     Salerno used his position and his authority as a board member to harass the company in the hopes of shaking it down for a very quick profit at the expense of the company of other shareholders.

52.     As became clear, Salerno was not up to the task of being a legitimate board member and honoring the obligations of a board member to keep the company's best interests at heart.

53.     Out of 10 board meetings he only attended 5.

54.     At those five meetings, Salerno voted against the otherwise unanimous votes of the parties actually deeply involved with the company 4 times and abstained from voting 6 times.

55.     Moreover, Salerno rarely was able to vote to approve minutes because, in his words, he "needed to check with his lawyer."

56.     Yet, despite all of this, 3 of the 5 board meetings Salerno attended were consumed with his discussion of whether or not he would suing the company — or Salerno rhetorically saying that he was "not pursuing legal action," but in fact was keeping his lawyer deeply involved.

***Salerno Tanks FINRA Approval for the Initial Business Plan.***

57.     During the early phases of Sport-BLX, in order to move forward with the business plan initially set out in the founder's round of investment, Sport-BLX hired an outside specialist to assist and advice in organizing its application to FINRA for various regulatory approvals.

58.     FINRA approval was essential to that initial business plan.

59.     Thus, following the guidance provided by the outside specialist in the FINRA process was essential to the Sport-BLX business plan as well.

60.     That specialist — Ken Norensberg, CEO of Luxor Financial Group— spent extensive time preparing the FINRA application.

61.     However, the vehicle Salerno used for investment — Cypress Holdings, III, LP —

7

was, by Salerno's insistence, a black box.

62.    Salerno never mentioned partners in the LLC.   Had he done so, the founders would have insisted upon disclosure of the members for traditional "know your customer" reasons..

63.    However, at FINRA's request, when asked to confirm if he was in fact the sole member, Salerno refused.

64.    He said several times, "it's none or your business"

65.    Salerno then and to this day, has refused to disclose virtually any information about the Cypress entity.

66.    Salerno specifically refused to disclose Cypress's ownership and investors.

67.    That information, however, was relevant, and Norensberg advised, needed to obtain FINRA approval.

68.    That is, FINRA approval would not occur without disclosing the details of Sport-BLX's ownership and investors, which, in turn, included Cypress Holdings, III, LP's ownership and investors.

69.    Norinsberg made the choice very clear:  either Cypress had to disclose its ownership and investors, or FINRA approval was not possible — and with it, the initial business plan also was not possible.

70.    SportBLX's outside counsel (Greenberg Traurig) provided the same advice to the Board, including to Salerno:  FINRA was entitled to the disclosures and that without them making application would be fruitless.

71.    Hall, De Perio, and Sport-BLX made extensive efforts to get Salerno to disclose the required details of Cypress's ownership and investor structure, explaining at length that his refusal was going to tank the business plan.

72.    Salerno refused to make the required disclosures.

73.     As an alternative, and an attempt to maintain the initial business plan, Sport-BLX made several offers to buy-out Salerno, at a significant profit to Salerno, including a 70% increase in his investment in a few short months with an offer to buy him out at $1.7 million.

74.     That buyout would have substantially increased Salerno's investment in a handful of months.

75.     That kind of return, even among the most skilled investors, is rare.

76.     Salerno refused these offers.

77.     Instead, Salerno demanded a buyout of $2 million.

78.     The company was already moving money away from its operations to offer Salerno $1.7 million — to give him $2 million was not possible given the start-up's need for capital.

79.     Salerno was aware, at all times, that his refusal to provide ownership and shareholder information would prevent FINRA approval.

80.     Salerno was aware, at all times, that without FINRA approval, the initial business plan could not be followed.

81.     Salerno was aware, at all times, that his refusal was an insurmountable obstacle to FINRA approval.

82.     Yet, despite his fiduciary duties to the shareholders of Sport-BLX, and without disclosing any reason, Salerno refused to make the required disclosures.

83.     Salerno made no attempt to honor his obligations as a fiduciary to the company.

84.     Instead, he (1) refused to make the rquired disclosures and (2) refused to walk away with a handsome profit for his investors, yet allowing the company and its other investors to thrive.

85.     Instead, in an attempt to wrestle even more out of the company, he began to use threats from lawyers as a club to force the company to pay him a premium that was just untenable.

86.     As a board member, his obligation is and was to put the company's interests ahead

9

of his own.

87.     Yet Salerno's placed a personal interest — maintaining the secrecy of his investors — ahead of the interests of the company.

88.     Even assuming that he had some obligation or reason to hide the identities of the shareholders from the government, the company gave him a perfectly good out: Take a 70% profit and walk away leaving the company to pursue its plan.

89.     Salerno refused that too.

90.     The FINRA application was thereafter withdrawn.

91.     The FINRA application was withdrawn because of Cypress and Salerno's conduct.

92.     So, with no ability to remove Cypress — and no ability to follow the initial business plan *with* Cypress — to mitigate the harm Salerno was doing, Sport-BLX and its Board were forced to develop a new business plan altogether.

93.     This failure caused severe harm to Sport-BLX and its shareholders.

94.     Third-party valuations placed Sport-BLX's value, prior to abandoning its original plan which required FINRA approval, at $35,000,000.00.

95.     As Salerno himself admits, the business plan was a "successful proof of concept." Dkt. No. 16 ¶ 21, *Cypress v. Hall et al.*, 22-cv-01243 (SDNY).

96.     Defendants together, because of their actions, are liable to Sport-BLX and all the other shareholders for the missed opportunity and value of the initial business plan: but for their actions, Sport-BLX would have attempted to gain FINRA approval, and been able to continue to follow the initial business plan.

97.     Of course, this was an enormous drain on the company.

98.     Analyzing different ways to make the company profitable while not being able to pursue the original plan was a difficult challenge, but the company did what it could.

99.     As Salerno and Cypress concede in their own complaint (Dkt. No. 16 ¶ 21, *Cypress v. Hall et al.*, 22-cv-01243 (SDNY)), the initial business plan would have been immensely profitable.

100.    As explained above, that value was at the time well over $35,000,000.00.

101.    Calculated and adjusted to account for continued growth, the amount, to be determined by a jury, is likely significantly higher.

102.    Therefore, Salerno and Cypress are liable Sport-BLX (behalf of the absent shareholders) and the Individual Plaintiffs for the value of the plan Salerno and Cypress knowingly thwarted.

***Salerno's engages in other harassing conduct, and loses a Board election.***

103.    Throughout 2019, acting by and through NPPG, Salerno harassed Sport-BLX and its Board.

104.    Every email Salerno sent to the Board was signed in his capacity as "Founder & CEO" of NPPG.

105.    Upon information and belief, Salerno and NPPG knew those things did not exist.

106.    Those requests, attached to emails, were accompanied by a legend stating, among other things, "the document accompanying this communication contains information from NPPG, including its members and affiliates."  Not "may" contain — does "contain."

107.    Attached as **Exhibit A** is an example, from May 21, 2019, of such a request.

108.    While the request nominally disclaims "at present time I am not taking any legal action nor threatening legal action against Sport-BLX, its assets, securities or its employees," it was cc'd to Marc Gross of Fox Rothschild, who threatened to sue Sport-BLX's executives less than a month later.

109.    The request read not like routine corporate oversight requests, but like litigation

11

document requests

110.    Later in the year, Salerno made a formal books and records demand for himself and his advisor to review — requiring burdensome efforts to answer.

111.    Of course being a startup company on a limited budget with everyone working extraordinarily hard to develop the business this was a very time consuming demand

112.    Notwithstanding that, obligated by law to comply, Sport-BLX organized all of the information Salerno requested, at some expense.

113.    Despite giving him a generous window of time, Salerno simply failed to show up to review it.

114.    Salerno and NPPG's books and records demand took time away from copmay business only to harass the company not for any legitimate concerns.

115.    If there was any legitimate concern Salerno and NPPG were attempting to investigate, Salerno would have shown up.

116.    After all of his antics, it should come as no surprise that other investors in Sport-BLX — having lost out on a lucrative business plan because of Salerno's refusal to disclose *basic* information — were sick of it.

117.    While Hall and De Perio were arguably[2] contractually obligated to — and in fact *did* — vote their shares at the annual meeting in favor of keeping Salerno on the Board, the balance of the shareholders voted for another director, as it is the shreholders' collective right to do.

118.    To the extent he did (and the *Cypress* suit suggests he did), Salerno was grossly mistaken and unreasonable to assume that Hall and De Perio could guarantee him a seat on the

---

[2] The contract at issue — the side letter described above — technically obligates Hall and De Perio to vote for *Cypress* as a board member.  Under Delaware law, however, that contract would be void for illegality.  *See* 8 Del. Gen. Corp. L. § 141(b) ("The board of directors of a corporation shall consist of 1 or more members, each of whom shall be a natural person").  Nothing herein is intended to waive the argument that the relevant provision of the side letter was void and created no voting obligations.

Board.

119.    Only the majority of shareholders can appoint board members, per Delaware law and the company's bylaws.

120.    What Hall and De Perio could do was agree to vote for him.

121.    They did.

122.    But Salerno lost that vote.

123.    At the annual meeting of the Board on December 23, 2019, Salerno was not re-elected.

### Salerno intentionally tanks the value of the company.

124.    After being silent for a while, and watching significant progress from the company, Salerno then retaliated, notwithstanding his continuing duties of loyalty as a former Board member.

125.    Salerno invented — from whole cloth and without any support — a narrative that Hall and De Perio were "siphoning" money away from Sport-BLX.

126.    Salerno — often acting by and through NPPG — started sharing that narrative with anyone who would listen:  current Board members, shareholders, potential investors, and so on.

127.    Upon information and belief, Salerno had absolutely no evidence to support these allegations.

128.    Indeed, Salerno was encouraged to produce any evidence at all to the Board.

129.    Salerno did not do so.

130.    These allegations had serious financial consequences.

131.    It is fairly routine in the start up space to raise multiple rounds of capital.

132.    Here, the company received significant capital injections from its majority

13

shareholder.   But eventually the company needed to go to market to raise the capital it needed.

133.    And those raising those funds have significant duties of disclosure and honesty.

134.    Sport-BLX could not ethically raise funds without disclosing Salerno's allegations.

135.    And the simple fact of those allegations, even without any duty of disclosure, made raising capital impossible.

136.    So, Sport-BLX, needing an infusion of capital to keep moving, was unable to raise funds.

137.    Hall and Sport-BLX even asked Salerno to formally raise his complaints, resolve them, review any documents he needed to, and then withdraw them if they were unsupported.

138.    Instead, Salerno offered nothing in support of his accusations.

139.    Instead, Salerno kept calling Board members and potential investors, making allegations that ultimately stopped them from raising much needed capital in the Sport-BLX project.

140.    If that infusion of capital had taken place, Sport-BLX would have been able to continue its trajectory of providing massive returns for its shareholders.

141.    Instead, the current value of Sport-BLX , under the threat of litigation, and with frivolous — but serious — claims out there, may be worthless.

142.    The two causes for that are obvious:

a.    Salerno's intentional efforts to prevent much needed capital from keeping the company viable; and

b.    Salerno's bringing of a frivolous RICO and securities fraud lawsuit and accompanying press efforts, which similarly scared off potential investors.[3]

---

[3] Claims directly related to these efforts, because they sound primarily in abuse of process and similar claims, are not ripe until that suit is dismissed.  Plaintiffs intend to file that suit as soon as the relevant claims accrue.

14

143.    Therefore, Salerno, NPPG, and Cypress are liable Sport-BLX (on behalf of the absent shareholders).

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty (Against Salerno)

144.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs as though they were fully set forth herein.

145.    As Board Members and officers of Sport-BLX, Salerno owed fiduciary duties of care, loyalty, and good faith to Sport-BLX's shareholders, including Plaintiffs.  Salerno owed fiduciary duties included obligations to exercise good business judgment, to act prudently in the operation of Sport-BLX's business, to discharge their actions in good faith, to act in the interests of Sport-BLX and its shareholders, and to put the interests of Sport-BLX before their own.

146.    Those duties survived Salerno's termination as a Board Member.

147.    Salerno breached his fiduciary duty of care by, among other things:  harassing Sport-BLX management and other officers, making bad faith records requests they never even reviewed the results of, failing to comply with the terms of Sport-BLX's governing corporate documents and applicable corporate law, and otherwise acting in persistent and general bad faith.

148.    Salerno further breached his duties by, among other things, refusing to disclose their ownership and investors both (1) to the Board and Sport-BLX management and (2) to FINRA.

149.    Salerno further breached his duties by making serious, but baseless, allegations, knowing that Sport-BLX would need to disclose those allegations if it wanted to raise capital — with the intention of stopping Sport-BLX from raising the capital it needed to continue its business.

150.    Any of these standing on its own would have caused serious problems.

151.    Together, those refusals cost Sport-BLX's shareholders approximately

$35,000,000.00 looking backward from Salerno's termination, and a significant amount more to be determined at trial looking forward.

152.    Salerno's refusal to make routine disclosures was a clear instance where Salerno placed his idiosyncratic, personal desire not to reveal routine information above the interests of Sport-BLX and its shareholders.

153.    Salerno's malicious use of frivolous allegations and the fact that Sport-BLX's management was ethically conscious placed his idiosyncratic, personal desire for revenge and recognition above the interests of Sport-BLX and its shareholders.

154.    Further, Salerno refused a buyout that nearly doubled his initial investment. That suggests Defendants acted purely out of malice.  And it reflects a failure to mitigate damages.

155.    Plaintiffs and other Sport-BLX shareholders have been damaged by Salerno's breach of their fiduciary duties, and are entitled to judgment to that effect.


### SECOND OF ACTION
### Tortious Interference with Prospective Economic Advantage
### (Against All Defendants)

156.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs as though they were fully set forth herein.

157.    As set out above, Defendants undertook wrongful conduct — to wit, refusing to disclosure the ownership and investors in Cypress and making baseless allegations — solely to harm Plaintiffs.

158.    That conduct was independently wrongful by virtue of Defendants' fiduciary duties to Sport-BLX and its shareholders.  The conduct was an independent tort as set out above, and involved the use of wrongful means.

159.    Defendants' conduct caused predictable harm:  as set out above, Defendants were

16

fully aware that without disclosure of their investors and ownership, Sport-BLX would not be able to follow the business plan all concerned viewed as a "successful proof of concept."

160.    Thus, Defendants conduct caused a loss in the amount of the expected value of the business plan.

**THIRD CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against Salerno, Cypress, and the Doe Owners)**

161.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs as though they were fully set forth herein.

162.    Every contract has the implied term that no party shall, in essence, act to prevent the other parties from receiving the fruits of the agreement.

163.    The collection of contracts the parties signed here primarily served the purpose of moving the unique Sport-BLX business model forward.

164.    As described at length above, the fruits of those contracts required Defendants to make certain disclosures.

165.    As also described at length above, it was made very clear to Defendants that a failure to make those disclosures would destroy the initial business plan.

166.    Defendants refused to make those disclosures.

167.    Defendants also refused a buyout offer that nearly doubled their investment.

168.    Refusing that offer constituted a refusal to mitigate the obvious and imminent damage the refusal to make FINRA-required disclosures would cause.

169.    Defendants' refusal to make those disclosures — and subsequent refusal to mitigate damages — prevented Plaintiffs from enjoying the anticipated fruits of the parties' contracts.

170.    Plaintiffs are therefore entitled to expectation and other damages, as if Defendants

17

had not breached the implied covenant of good faith and fair dealing — and as if they *had* made the FINRA disclosures or accepted the buyout.

## FOURTH CAUSE OF ACTION
### Aiding and Abetting Breaches of Fiduciary Duty
### (Against Cypress, the Doe Owners, and NPPG)

171.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs as though they were fully set forth herein.

172.    Cypress and NPPG colluded in, or aided and abetted, Salerno's breaches of its fiduciary duties as a member of the Board.

173.    Cypress and NPPG were active and knowing participants in all the conduct alleged above.

174.    Cypress and NPPG knew about, or recklessly disregarded, Salerno's breaches of fiduciary duty.

175.    Plaintiffs have been significantly injured as a result of Cypress and NPPG's wrongful conduct.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, the plaintiffs demand judgment against defendants as follows:

i.      actual and punitive damages defendants in an amount to be determined at trial;

ii.     disbursements, and costs of the action;

iii.    such other relief as the Court deems just and proper.

Dated: Brooklyn, New York

August 3, 2022

J. Remy Green

/s/

By: _____

Cohen & Green PLLC
1639 Centre Street, Suite 216
Ridgewood, NY 11385
Tel.: 929-888-9480
elena@femmelaw.com

WYLIE STECKLOW PLLC
Carnegie Hall Tower
152 W. 57th St, 8th Floor
New York, New YY 10019
(212) 566-8000
ecf@WylieLaw.com

19

## ATTORNEY'S VERIFICATION

I, J. REMY GREEN, an attorney duly admitted to practice before the Courts of the State of New York, affirm the following to be true under the penalties of perjury:

1. I am the attorney of record for the Plaintiff.

2. I have read the annexed Verified Complaint and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true. My beliefs, as to those matters therein not stated upon knowledge, are based upon facts, records, other pertinent information contained in my files.

3. I make this verification because Plaintiff does not reside in the County (Queens) where I maintain my offices.

Dated: Ridgewood (Queens), New York
   August 3, 2022

/s/

_____

J. Remy Green
Cohen&Green P.L.L.C.
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
 t: (929) 888-9480
 f: (929) 888-9457
 e: remy@femmelaw.com

20

Case 1:22-cv-08111-LGS   Document 6-1   Filed 10/04/22   Page 23 of 26

 Gmail

**remy green <remy@femmelaw.com>**

---

## Fwd:
1 message

---

**George Hall** <george.hall@clinton.com>                    Tue, Jul 19, 2022 at 4:25 PM
To: remy green <remy@femmelaw.com>, Wylie Stecklow <wylie@wylielaw.com>

Sent from my iPhone

Begin forwarded message:

**From:** Michael Salerno <msalerno@nppg.com>
**Date:** May 21, 2019 at 2:02:47 PM EDT
**To:** George Hall <geh@clinton.com>
**Cc:** 'Marc Gross' <Mgross@foxrothschild.com>

| This message was sent securely using Zix® |
|---|

Hello George,

See attached request for information as we discussed.

Cordially,

Michael M. Salerno

Founder & CEO

Northeast Professional Planning Group, Inc.

- *Employee Benefits & Retirement Planning*
- *Actuarial & Retirement Plan Administration*
- *Administrative Fiduciary & Consulting Services*

121 Monmouth Street

Red Bank, NJ 07701

Phone: (732) 758-1577 ext. 239  |  Fax: (732) 758-1582

www.nppgfs.com

<image001.jpg>
<image002.png>

You are hereby advised that any tax **or other professional guidance** contained in this communication or any attachments is not intended or written to be used, nor can it be used for the purpose of (i) avoiding any tax-related penalties under the internal revenue code or (ii) supporting, marketing or recommending any tax-related matters contained in this communication. **You are further advised that any e-mail communications from Northeast Professional Planning Group, Inc. ("NPPG") or its affiliates may originate from an electronic mailing address associated with any of NPPG or its affiliates, and the electronic mailing address used for any specific communication is not indicative of the entity whose services have been retained.** Confidentiality notice: the document accompanying this communication contains information from NPPG, including its members and affiliates, which is confidential and/or legally privileged. If you are not the intended recipient named above, you are hereby notified that any disclosure, copying, or distribution of the information is strictly prohibited, and the documents should be returned to this firm immediately. If you have received this communication in error, please notify us by telephone immediately **and before accessing or distributing this communication or any accompanying documents or attachments.**

This message was secured by **Zix**®.
<Request for Information 5-21-19.docx>

Disclaimer

Clinton Group makes every effort to use reliable information, but cannot make any representation to the accuracy or completeness of the information in this email or items attached to this email. The recipient should note that any disclaimers presented in the attachments are construed to be part of the content transmitted in the body of the email. Do not expect us to inform you if the information contained herein changes or is updated. We do not accept any liability relating to this information, its completeness or timeliness. This email and the information contained in it and attached to it is not an offer to buy or sell (nor a solicitation of a proposal to buy or sell) securities, funds or any financial instrument. Any such offer or solicitation may be made only by delivery of a private placement memorandum and other offering documents. Clinton Group and/or its employees may have an investment in, and may effect transactions in, securities and derivatives of securities of companies mentioned in this email. We do not provide tax, legal, regulatory or other advice; we recommend that investors seek advice from independent advisers. Past performance is not necessarily indicative of future performance. The information herein may not be redistributed without the prior written consent of Clinton Group and is not intended for non-professional investors.

Per our previous conversation, as a Founding Shareholder and Director I am respectfully requesting the following information with regarding Sport-BLX ("BLX") and its related parties be provided to me by May 31, 2019.

For further clarity, at present time I am not taking any legal action nor threatening legal action against Sport-BLX, its assets, securities or its employees.

1. Current financial statements year to date through April 30, 2019; including but not limited to general ledger, profit and loss statement, balance sheet, cashflow statement, etc…

2. Minutes and notices for each of the shareholder meetings held to date.

3. Minutes and notices for each of the board meetings held to date.

4. What is cash on hand and cash expected to be received vs. upcoming expenditures to get an understanding of cashflow needs over the next 30, 60, 90, day periods

5. How much has John Howe committed to invest and what are the terms of his investment in BLX and or the Fund including any future commitment, side letter or the like?

6. Provide names of current shareholders and details of the amount invested. Including any side letter or the like.

7. Describe the non-monetary value that each of the shareholders adds to BLX

8. Provide names of potential investors and the BLX valuation that has been offered to each potential investor(s) by BLX or anyone on behalf of BLX ( ie … third parties, centers of influence, etc… ) ?

9. Identify third-parties, consultants, centers of influence and the like that have or will introduce potential athletes, investors and or partners to BLX?

10. It has been established that at minimum the President and CEO of BLX have been meeting with potential investors with the intent to raise capital for a "Fund" which would purchase interests in athletes and subsequently sell that interest via BLX.  Provide the names of potential investors and the valuation of the Fund that has been offered to each potential investor(s)?

11. Describe the BLX resources that have been used to facilitate the efforts of raising capital for the Fund?

12. Since March 1, 2019 what has BLX spent in efforts to raise capital for BLX?

13. Since March 1, 2019 what has BLX spent in efforts to raise capital for the Fund?

14. Describe how the Fund will benefit BLX?

15. What interest does or will BLX have in the Fund?

16. Who are the Principals of the Fund?

17. Who are the current or considered shareholders of the Fund?

18. Provide any written or verbal agreement or considered agreement between the Fund and BLX

19. Provide Pipeline of potential or recently committed investors and provide a copy of their shareholders agreement including any side letter or the like.

20. Provide pricing for customers of BLX If such has not been set then provide pricing that is being considered

21. Provide copy of employment agreements currently in place for all employees

22. Provide copy of the current lease

23. Provide copy of any new contracts or agreements, since March 1, 2019, that BLX has executed or is considering executing?

24. Provide details surrounding all related party transactions; including but not limited to the Fund and the current lease.

25. Provide copy of each presentation used with each potential investor where BLX was described or referred to injunction with the Fund.