UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SPORT-BLX, INC., individually and derivatively
on behalf of its shareholders,

                              Plaintiff,

        v.                                                  Civil Action No. 1:22-cv-8111-LGS

MICHAEL M. SALERNO and CYPRESS
HOLDINGS, III, L.P.,                                        **JURY TRIAL DEMANDED**

                              Defendants.

## AMENDED COMPLAINT

Plaintiff Sport-BLX, Inc. ("Sport-BLX"), a Delaware corporation, by and through its

attorneys, alleges as follows:

## OVERVIEW

1.      Sport-BLX brings these claims to seek damages for the self-interested and

destructive campaign of deceit, harassment, and false accusations by its former board member

Michael M. Salerno ("Salerno") and shareholder Cypress Holdings, III, L.P. ("Cypress").

2.      Sport-BLX was formed in 2018 with a unique business model.  It would serve as

an online marketplace for sports-related assets, for example, by allowing retail investors to own

shares in athletes' revenue streams, a professional sports team, and other sports assets.  That idea

was potentially very lucrative.  A number of individuals and entities invested in Sport-BLX.

3.      Cypress, of which Salerno purports to be the managing partner, became one of

those investors by acquiring shares of Sport-BLX in February 2019 for $1 million.  As part of

that purchase of stock, Salerno later became a member of Sport-BLX's board of directors.

4.      Salerno made materially false and misleading statements and omissions—about what Cypress was and who owned it—in connection with Cypress's acquisition of Sport-BLX stock.  While extensively negotiating Cypress's investment, Salerno initially told Sport-BLX that he alone was purchasing Sport-BLX shares but then abruptly, literally minutes before signing a stock purchase agreement, substituted in Cypress as the buyer, describing it as "my holding company."  In truth, Cypress had *18 separate investors*—including a convicted felon, multiple corporate entities, and several plaintiffs in an ongoing investment-related lawsuit in New York state court.  Salerno disclosed none of this to Sport-BLX and, in fact, made materially false and misleading statements and omissions designed to conceal this material information.[1]  Had Sport-BLX known the truth, it would not have permitted Cypress to purchase Sport-BLX stock and consequently would not have allowed Salerno to become a director of Sport-BLX.

5.      Almost immediately after Cypress purchased Sport-BLX shares, Salerno and Cypress began to throw sand in the gears of Sport-BLX's operations.  Instead of advancing Sport-BLX's business activities, Salerno promptly began demanding that Sport-BLX's managers collect and provide him with voluminous information, while insisting on unreasonable deadlines for production of the material.   He began complaining about missing information and diverting management's energy and attention away from developing the business and toward responding to his frivolous complaints.   Salerno's actions and words were consistently hostile to the other owners, and managers, of the business.

6.      After Salerno made it clear that he was unhappy with Cypress's investment, he asked for a buyout of Cypress's shares.  Yet rather than negotiate a reasonable share price for a

---

[1] After refusing to identify its owners for months, and stating that owner-related information was not relevant to the case, Cypress disclosed its limited partners' identities after being ordered to do so by the Court.  *See* Dkt. 28.

buyback, on May 29, 2019, Salerno proposed a buyout of *$2 million* for Cypress's shares, at a price of over *$257 per share*.  At the time, as Salerno knew, Sport-BLX was issuing shares at only $200 per share; thus, agreeing to Salerno's self-interested demand effectively would have meant a loss to the company of $57 per share—a loss that would have been borne by Sport-BLX's other shareholders.  Hall rejected Salerno's demand pursuant to his fiduciary duties to Sport-BLX.

7.     When the unreasonable buyback demand was not met, Salerno and Cypress continued to harass Sport-BLX with the aim of destroying its value in the hope that Sport-BLX's management would succumb to Cypress's buyout demands.  Salerno and Cypress made frivolous threats of legal action against the company—including through letters sent by counsel with a plain conflict of interest.  None of those threatened claims had merit.  They were brought to punish and harm Sport-BLX and enrich Salerno and Cypress.  Indeed, Salerno and Cypress further demonstrated their self-interested purpose by making another buyout demand in July 2019.

8.     Although Sport-BLX's management continued to serve the company faithfully, Salerno and Cypress went further and actively sought to interfere with the execution of Sport-BLX's business plan.  Specifically, Salerno and Cypress refused to provide Sport-BLX with the identities of all of Cypress's owners—information that was required for a Sport-BLX subsidiary to register as a broker-dealer and market securities to the investing public.  In an effort to justify his refusal to provide the necessary information, Salerno said that he did not want to disclose his "estate plan."  This was a lie (unknown to Sport-BLX at the time) which not only gutted Sport-BLX's existing business model—a business model that was well-known to Salerno and Cypress—but also enabled Salerno and Cypress to conceal their earlier materially false and

misleading statements and omissions which they had made in order to purchase Sport-BLX shares in early 2019.

9.      Through their various acts of interference, Salerno and Cypress used their negative control over Sport-BLX's business opportunities as leverage in their ongoing campaign against Sport-BLX.  Despite their fiduciary obligations, that campaign was based entirely on their self-interest, not the good-faith exercise of care and loyalty on behalf of Sport-BLX.  In a glaring example, in November 2019, a critical period for Sport-BLX's business operations, Salerno and Cypress made a detailed books-and-records request—forcing Sport-BLX to devote substantial time and resources to organizing documents for his review—and did not bother to come and review those materials.

10.     This pattern of materially false and misleading statements and omissions and bad faith culminated in or about October 2021, when Salerno falsely accused Hall—without any basis or specifics—of siphoning corporate funds for his own use.  That accusation, for which Salerno offered no support, frustrated efforts to raise much-needed capital for Sport-BLX (which Salerno knew were underway) and operate the business.  Cypress followed these false accusations with a meritless lawsuit in January 2022, which was the last straw in Salerno's campaign to harm Sport-BLX and Hall.

11.     Sport-BLX brings these claims to remedy Salerno's and Cypress's years-long pattern of materially false and misleading statements and omissions, bad faith, and self-serving conduct.

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between the parties.  Plaintiff Sport-BLX is a Delaware corporation with its principal place of business in New York, New York.  Defendant Michael Salerno is a citizen of New Jersey.  Defendant Cypress is a Delaware limited partnership whose general and limited partners are all citizens of New Jersey.  *See* Dkts. 18, 18-1.

13.     This Court also has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because Sport-BLX's claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (17 C.F.R. § 240.10b-5) arises under the laws of the United States, and Sport-BLX's remaining claims are so related as to form part of the same case or controversy as the Section 10(b) and Rule 10b-5 claim.

14.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this District.

## THE PARTIES

15.     Sport-BLX is a corporation organized and existing pursuant to the laws of the state of Delaware, with its principal place of business located in New York, New York.

16.     Defendant Cypress is a limited partnership organized and existing pursuant to the laws of the state of New Jersey, with its principal place of business located at 494 Sycamore Avenue, Shrewsbury, New Jersey 07702.

17.     Defendant Salerno is the managing partner of Cypress and a former board member of Sport-BLX.

## FACTUAL ALLEGATIONS

### I.     Sport-BLX's Development

18.     Sport-BLX grew out of an interest among sports fans and retail investors in purchasing ownership stakes in sports-related assets.  Historically, that kind of investment—such as owning a thoroughbred racehorse—has been prohibitively expensive for all but the most well-funded investors.

19.     Sport-BLX was designed to make such investments more accessible.  Sport-BLX would use blockchain technology[2] to tokenize sports-related assets, sell shares of the assets to retail investors, and provide an online trading platform that would serve as a private market exchange for those shares.  Sport-BLX was established by George Hall ("Hall"), Joseph De Perio ("De Perio"), and several others to pursue that opportunity.

20.     In or about late 2018, the company began soliciting investments.  Potential investors were provided materials that outlined Sport-BLX's business model, including a business plan, a proposed budget containing operating expenses, and additional financial details. Those materials were prepared with the assistance of ConsenSys AG, a well-known technology company with extensive experience with blockchain-related enterprises.

21.     Several investors soon committed funding to Sport-BLX.  By January 2019,

---

[2] Blockchain technology is "an electronic distributed ledger list of entries—much like a stock ledger—that is maintained by various participants in a network of computers."  *Investor Bulletin: Initial Coin Offerings*, U.S. SEC. & EXCH. COMM'N., https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings (last visited Feb. 6, 2023).  Each computer in the network "use[s] cryptography to process and verify transactions on the ledger."  *Id.*  "In general, the first node to identify the cryptographic hash corresponding with a proposed transaction verifies that transaction and adds it to the public ledger, *i.e.*, as a block on the virtual chain."  *Williams v. Block one*, No. 20-CV-2809 (LAK), 2022 WL 5294189, at *1 (S.D.N.Y. Aug. 15, 2022).  The other nodes in the network then verify the transaction and incorporate it into the blockchain's ledger.  *Id.*  Blockchain technology thus "allows investors to buy and sell" assets in a secure, decentralized environment.  *Id.*

Sport-BLX had approximately $1.8 million in funding.

**II.     Cypress Purchases Sport-BLX Stock**

22.     Salerno first expressed interest in purchasing stock in Sport-BLX in early 2019.
Soon afterwards, he discussed a potential purchase with several Sport-BLX representatives in
several meetings, including a meeting at Sport-BLX's New York offices.

23.     Salerno also performed extensive due diligence on the Sport-BLX opportunity
before he executed a stock purchase agreement.  Sport-BLX representatives sent Salerno
PowerPoint slide decks and written materials outlining Sport-BLX's business plan.  They also
provided Salerno with access to a data room containing written materials on Sport-BLX's
business model, including a business plan, a proposed budget including operating expenses, and
additional financial details.

24.     Sport-BLX's due diligence materials—which Salerno had access to as early as
February 1, 2019—made clear that, while the business had potential, it was high-risk and Sport-
BLX could not guarantee it would be profitable.  As a sophisticated investor with substantial
business experience and access to legal counsel, Salerno knew that Sport-BLX was a risky
venture and its success was uncertain.

25.     Salerno and Cypress knew from the outset that Sport-BLX's business model
depended on the company's ability to sell shares of athletes' revenue streams to retail investors
and collect commissions from those sales.  Sport-BLX's original business plan had anticipated
that those commissions would constitute Sport-BLX's revenue stream.  That message was
conveyed to Salerno by Sport-BLX's due diligence materials and in meetings.

26.     Aware of those facts, Salerno agreed in late January 2019 to invest $1 million in
Sport-BLX.  He asked to buy $500,000 worth of Sport-BLX stock at the first-round company

valuation of $9.5 million, and another $500,000 of Sport-BLX stock at the second-round

valuation of $25 million.   Sport-BLX agreed to that purchase, based on both the first- and

second-round valuations, as an accommodation to Salerno.

27.     That investment was memorialized in three agreements (the "Investment

Agreements").  First, a Common Stock Purchase Agreement provided for the purchase of 5,263

shares of Sport-BLX common stock at a price of $95 per share.  Second, another Common Stock

Purchase Agreement provided for the purchase of 2,497 shares of Sport-BLX common stock at a

price of $200.18 per share.  Third, in a separate letter (the "Side Letter"), Hall and De Perio

agreed to vote their Sport-BLX shares in support of Salerno to Sport-BLX's board of directors at

shareholder meetings so long as he continued to own at least 2.5% of capital stock of Sport-BLX.

28.     Salerno received drafts of the Investment Agreements in early February 2019, all

of which included his name in the heading, the body of the agreements, and the signature line.

He then extensively negotiated those Agreements with Sport-BLX.  Throughout over four weeks

of negotiations, Salerno repeatedly represented that he would be investing in Sport-BLX

individually.  Initial drafts and Salerno's mark-ups of the Investment Agreements consistently

reflected and reiterated that fact, identifying the purchaser as "Michael M. Salerno."

29.     But, on February 28, 2019—the very day the deal was to be finalized—Salerno

abruptly changed course when—***less than one hour*** before executing the Investment

Agreements—he claimed that the Agreements needed to be "update[d] with "my holding

company['s] name."  He then unilaterally changed the Investment Agreements to reflect for the

first time that ***Cypress*** was the purchaser and sent executed copies of the revised Agreements to

Sport-BLX.  By means of these acts, omissions and statements, Salerno and Cypress

intentionally misled Sport-BLX about what Cypress was and who owned it.

30.     Salerno continued his dishonest conduct the same day by separately revising the Side Letter to define Cypress as "Salerno"; until then, that defined term referred only to Salerno individually.  This revision to the Side Letter made by Salerno himself once more informed Sport-BLX that Cypress and Salerno were alter egos, and that Salerno was Cypress's sole owner. At no time did Salerno convey, directly or indirectly, that Cypress was, in fact, a pooled investment vehicle owned by a diverse array of 18 separate limited partners, including multiple trusts and corporate entities and a convicted felon.

31.     In addition, also undisclosed to Sport-BLX, several of Cypress's limited partners were plaintiffs in an ongoing investment dispute filed in New York state court in January 2019— *less than two months* before Sport-BLX was misled into allowing Cypress to purchase Sport-BLX shares.  That lawsuit was filed after the Cypress limited partners claimed that the general partner of the defendant fund had withheld information and misappropriated funds.  Salerno told Sport-BLX nothing about the Cypress limited partners' active lawsuit while he was conducting due diligence on, and negotiating, Cypress's purchase of Sport-BLX shares (and his demand for a Sport-BLX board seat).

32.     In August 2019, Sport-BLX asked Salerno to disclose the owners of Cypress in connection with an application to FINRA (*see* paragraphs 53 -67 *infra*), but Salerno initially ignored the request and then ultimately refused to disclose the information, thereby concealing Salerno's and Cypress's earlier materially false and misleading statements and omissions.  Even after this case was filed, Cypress and Salerno refused to identify the Cypress limited partners in response to discovery requests, claiming that the requests were "harassing" and the information sought "irrelevant" to the case.  Finally, on February 3, 2023, only after compelled by the Court, Salerno and Cypress finally identified its limited partners to Sport-BLX.  Dkt. 28; *see also* Dkts.

25, 27.

### III.   Salerno and Cypress Make an Outrageous Buyout Demand in an Attempt to Extract Sport-BLX Capital for Themselves

33.     After executing the Investment Agreements on February 28, 2019, Salerno delayed wiring Cypress's investment funds to Sport-BLX for weeks.  Only in March 2019—after Hall and De Perio told Salerno that Sport-BLX would not take Salerno's investment, given his long delay in sending the funds—did Salerno finally wire the investment funds to Sport-BLX.

34.     By spring 2019, Sport-BLX had made significant progress on its business plan. The technology required for Sport-BLX's trading platform was developed, and Sport-BLX began recruiting professional athletes interested in partnering with Sport-BLX to sell shares of their revenue streams.  Sport-BLX representatives secured a preliminary deal with a player in the National Basketball Association.

35.     By that point, Sport-BLX had made extraordinary progress in a limited period of time.  Well-known sports agents expressed interest in working with Sport-BLX to find athlete-partners.  Advertising firms were similarly eager to help monetize Sport-BLX's novel partnerships with athletes.  Sport-BLX was getting much closer to bringing its business plan to fruition.

36.     This progress was made despite Salerno's behavior, not with his support and participation.  During his tenure as a director, Salerno showed almost no interest in Sport-BLX's success.  He attended *only half* of the company's ten board meetings and abstained from voting *six times*.  On the rare occasions that Salerno did participate in a major decision, he cast his vote *against* the otherwise-unanimous votes of the other board members—all of whom were significantly more informed of the company's activities than Salerno.  By all appearances, Salerno cared very little about Sport-BLX's actual business activities or its shareholders.

10

37.     Instead, Salerno was focused almost exclusively on enriching himself quickly at Sport-BLX's expense.  It became clear that Salerno's sole goal was to make money for himself from Sport-BLX, and that he was prepared to exploit his director position for that purpose.

38.     Almost immediately after being elected to Sport-BLX's board of directors, Salerno launched a campaign of harassing conduct with the aim of pressuring Sport-BLX to pay him as much money as possible, as quickly as possible.

39.     In May 2019—only two months after finalizing Cypress's investment, and before Sport-BLX had even *held a board meeting*—Salerno demanded that Sport-BLX's management answer an extensive list of questions about Sport-BLX.  That list was plainly intended to harass.  It was also unnecessary.  Before investing in Sport-BLX, Salerno had received extensive information in due diligence.  Later, as a director, Salerno was being provided with information relevant to Sport-BLX's plans and operations, and Hall offered to discuss any remaining concerns Salerno had, but Salerno refused.

40.     Salerno's and Cypress's complaints about missing information were not made in good faith.  They were part of an effort to frustrate Sport-BLX's business plan and wrest an excessive buyout from Sport-BLX.

41.      Salerno and Cypress then made an unreasonable demand.  In a May 29, 2019 email, they insisted that Sport-BLX buy Cypress's shares at a price of over *$257 per share*, for a total of *$2 million*.

42.     Salerno's and Cypress's $2 million buyout demand was a non-starter.  The $257 share price was far higher than the current $200-per-share value of Sport-BLX shares based on recent market transactions.  Acceding to Salerno thus would have amounted to giving up $57 per share in value to the company, a cost that Sport-BLX's other investors would have to absorb.

11

Additionally, paying that amount would have drained the company of money and forced it to use capital from other investors to buy out Cypress.  In a May 29, 2019 email, Sport-BLX rejected Salerno's and Cypress's demand.

43.     Salerno's and Cypress's demand was also substantially higher than what other Sport-BLX shareholders had received in good-faith, arms-length buyouts, as Salerno knew. Around the same time, another investor had accepted a buyout offer that paid $118.75 per share. Thus, the $257-per-share demand was not only contrary to the company's best interests; it also bore no connection to commercial reality.

### IV.   Salerno's and Cypress's Pattern of Threats, Harassment, and False Accusations in an Effort to Damage Sport-BLX and Destroy its Value

#### A.   June and July 2019:  Salerno and Cypress Harass Sport-BLX with Frivolous Threats of Litigation

44.     After Sport-BLX's refusal of the $2 million buyout demand, Salerno and Cypress ramped up their campaign of harassment, false accusations, and threats intended to destroy Sport-BLX's value and harm Hall personally.

45.     On or about June 10, 2019, after Sport-BLX refused their buyout demand, Cypress and Salerno, through counsel, threatened to sue Sport-BLX (the "June 2019 Letter"). Shockingly, Cypress's and Salerno's counsel also represented another Sport-BLX shareholder and was thus plainly conflicted from representing Cypress and Salerno.

46.     The June 2019 Letter made two claims; each was frivolous.  First, the Letter complained that Cypress and Salerno had expected Sport-BLX to have a "partnership interest" in an investment fund that would have generated income for shareholders.  At the time of this complaint, Salerno knew that such a fund did not exist.  Sport-BLX did not have an interest in any such fund.

47.     Second, the June 2019 Letter accused Sport-BLX of spending too much to rent office space.  It claimed that Sport-BLX's rent was "excessively suspect" for "an occupancy for less than five (5) employees."  It also implied that Sport-BLX was improperly leasing its office space from Clinton Group, Inc. ("Clinton Group"), in which Hall has an interest.

48.     These claims were also false.  Sport-BLX was paying considerably less per square foot than the office's previous tenants, and Sport-BLX's expenditures for using the office space were shared with Clinton Group (which also used the space).  That arrangement allowed Sport-BLX to share resources and equipment with Clinton Group, which further defrayed business expenses.  Sport-BLX's allocations of office-space and operating expenses were reasonable and justified, as Salerno knew.

49.     Sport-BLX's offices also had a valuable business purpose.  Up to 30 people worked in Sport-BLX's offices during the first few months that the company used the space, and Sport-BLX intended to add space for more workers as the company grew.  Further, the company was actively engaged in soliciting investors and potential athlete-partners throughout its first few years of existence.  Sport-BLX's offices—which offered spacious conference rooms and a convenient location—thus served an essential marketing function as Sport-BLX developed its business.

50.     Salerno's bad faith in raising those claims is underscored by his prior review of due diligence materials, which detailed the company's expected rental expenses.  Sport-BLX's actual rental expenditures were consistent with those projections.  Salerno had also met with Hall and De Perio in Sport-BLX's offices before deciding to invest.  During that meeting, Hall explained the need for the office space.  Salerno was thus fully aware of Sport-BLX's rental of space and expenditures before deciding to invest.  Cypress invested in Sport-BLX nonetheless.

51.     Salerno's threats of litigation, based on false claims, were inconsistent with his duty of loyalty as a Sport-BLX director.  Further illustrating his disloyalty and self-interest, three of the five board meetings he attended were consumed with discussions of whether he would sue the company, which he repeatedly denied despite having ***already threatened to sue*** Sport-BLX in June 2019.  (As Salerno knew, even frivolous legal claims could cripple Sport-BLX's business opportunities.)

52.     Salerno's threats also were plainly designed to wrest a favorable buyout of Cypress's shares.  In a July 28, 2019 email to Hall, Salerno again asked Hall to make a buyout offer which Salerno packaged as a "resolution" that could avoid "additional stress," but was, in reality, a windfall he sought for waging a campaign of harassing conduct.

**B.   August and September 2019:  Salerno and Cypress Refuse to Disclose Cypress's Ownership and Ruin Sport-BLX's Original Business Plan**

53.     In August and September 2019, Salerno's and Cypress's efforts to harm Sport-BLX intensified and caused near fatal damage to the company.  Specifically, they intentionally impeded Sport-BLX's ability to register as a broker-dealer, effectively holding Sport-BLX hostage for the purpose of protecting their personal interests and concealing their earlier materially false and misleading statements and omissions regarding Cypress's true ownership.

54.     For several months during 2019, Sport-BLX—with the assistance of a consulting firm that specializes in establishing broker-dealers—worked on a broker-dealer application with the Financial Industry Regulatory Authority ("FINRA").  That application would permit Sport-BLX's wholly owned subsidiary, BLX Trading Corp. ("BLX Trading"), to sell securities to retail investors, which was a central component of the company's business model from the start.

55.     In August 2019, Sport-BLX learned that, as part of its broker-dealer application, FINRA instructed Sport-BLX to submit the identities of all of Sport-BLX's indirect beneficial

14

owners.  For a shareholder-entity like Cypress, that requirement meant providing the identities of the shareholder-entity's owners until the natural-person owners of all entities in the chain of ownership had been identified.  That information was critical to Sport-BLX's success.  If Sport-BLX failed to comply with FINRA's request—and thus failed to obtain FINRA broker-dealer registration—the company could not collect commissions from sales.

56.     Sport-BLX communicated FINRA's requirement to shareholders who had invested through business entities.  Each of those shareholders provided Sport-BLX with required ownership information—except for Cypress.

57.     Salerno refused to provide ownership information on behalf of Cypress, despite multiple requests from Sport-BLX.  De Perio first conveyed that request to Salerno in an August 5, 2019 email, telling Salerno that "as a matter of normal course," Sport-BLX would need "the beneficial owners of Cypress . . . , the shareholder of record."  When Salerno failed to respond, De Perio repeated Sport-BLX's request.

58.     In an August 8, 2019 email, De Perio explained that Sport-BLX "require[s] this information for ongoing FINRA compliance and to advance our business."  De Perio told Salerno the same thing in an August 9, 2019 email, emphasizing that "push[ing] forward the FINRA compliance" was needed "to advance [Sport-BLX's] business."  Salerno did not send De Perio the information in response.

59.     On August 9, 2019, Hall sent Salerno another email asking him to confirm Cypress's ownership information.  Once again, Salerno refused to provide that information.  On top of that, Salerno made a new false and misleading statement about Cypress, now claiming that Cypress was used for his estate-planning.  Salerno stated that "***my concern is my estate plan structure***, which I am not inclined to make public."  (Emphasis added).  In that email, Salerno

lied and did not tell Hall and Sport-BLX the truth—that Cypress had 18 separate limited partners whose existence (and status as Cypress investors) Salerno had concealed from Sport-BLX for many months, starting even before Cypress purchase Sport-BLX stock.

60.    Salerno had a number of reasons to conceal Cypress's ownership and mislead Sport-BLX.  In addition to concealing the original false and misleading statements in connection with Cypress's purchase of shares, the identity of one of Cypress's individual limited partners, a convicted felon, could have jeopardized Sport-BLX's FINRA application and prevented the company from carrying out its original business plan.

61.    Salerno's refusal to provide Cypress ownership information to Sport-BLX derived from a strictly self-serving desire to conceal his and Cypress's earlier misconduct and maintain, under false pretenses, ownership of Sport-BLX shares and Salerno's board seat.  In acting for these reasons in this fashion, Salerno violated his fiduciary obligations.

62.    Salerno and Cypress knew that refusing to provide Cypress's ownership information would stop Sport-BLX's original business plan dead in its tracks.  Salerno had attended Sport-BLX board meetings in which the board discussed how the lack of broker-dealer registration would bar Sport-BLX from collecting *any* commissions from securities, which Salerno knew was essential to Sport-BLX's business model.

63.    Despite their fiduciary duties, Salerno and Cypress consistently refused to disclose Cypress's beneficial owners.  At an August 14, 2019 Sport-BLX board meeting, Salerno told other directors that he did not intend to provide that information in response to FINRA's request.  He repeated that position in an August 16, 2019 email to Hall, stating that Sport-BLX's directors "do not have a right to this information at this time."

64.    At a September 10, 2019 board meeting, Hall explained to Salerno and other

directors that "a failure of Cypress to identify and disclose its beneficial owners would disqualify any broker-dealer application," and that FINRA's requirement was "not a topic that could be avoided."  Hall also informed the board that, based on expert advice, failure to comply with FINRA's beneficial-ownership requirement "would be fatal to any . . . broker-dealer trading application."

65.     Salerno and Cypress stubbornly refused to change their position following the September 2019 board meeting.  They included legal counsel on their communications with Sport-BLX in a transparent attempt to intimidate Sport-BLX with the looming threat of legal action.  Moreover, Salerno and Cypress persisted in refusing to provide the requested information—which was critical for Sport-BLX to move its business forward—even while making their own unnecessary demands on Sport-BLX for information.

66.     Salerno's and Cypress's refusal to provide Cypress's ownership information gave Sport-BLX no choice but to abandon its original business plan.  Thus, at the company's September 10, 2019 board meeting, Sport-BLX's board unanimously voted to "take steps to look at alternative ways" to monetize Sport-BLX's assets and adapt its business model.  Over the next few months, Sport-BLX spent valuable time and money working closely with counsel to assess the viability of its original business plan and to develop a new business plan.  Expending those resources kept the company from recruiting athlete partners, developing its technology, and raising capital.

67.     Salerno continued to refuse to disclose Cypress's ownership throughout his time as director and until ordered to do so in this litigation.  Because that refusal to disclose Cypress's ownership information continued for months or years, Salerno and Cypress's repeated acts of refusal were so intertwined as to amount to continuing wrongs.

**C. November 2019 to October 2021:  Salerno Makes Demands and Knowingly Brings False Accusations Against Hall**

68.     On top of Salerno's and Cypress's refusal to provide information needed for the broker-dealer application, Salerno continued to harass Sport-BLX and harm its prospects.

69.     In November 2019, for example, Cypress and Salerno, through new counsel (after prior counsel's conflict was revealed), formally asked to inspect certain corporate documents of Sport-BLX.

70.     Given Salerno's position as a director, Sport-BLX cooperated with his request pursuant to Delaware law.  Sport-BLX did so even though Salerno's conduct was plainly designed to burden the company with an unneeded fishing expedition and was thus inconsistent with Salerno's fiduciary duties as a director.  Sport-BLX employees carefully collected and organized the documents in Sport-BLX's offices, then invited Salerno to review them at his convenience.  Complying with the demand required a significant expenditure of time and resources from Sport-BLX.

71.     Sport-BLX's effort was for naught.  Despite his demands, Salerno did not come to Sport-BLX's offices to view the very documents he had asked to see.

72.     In the final board meeting of 2019 before the company's annual meeting, Salerno abstained from voting to renominate every director except Cesar Baez and himself.  Salerno offered no alternative nominees for those from which he had abstained from voting.  In fact, during his entire tenure on Sport-BLX's board, Salerno's only personnel suggestion was a retired jockey.

73.     Salerno's term as a director ended on December 23, 2019, when he was not reelected by a shareholder vote at Sport-BLX's annual meeting.[3]  But even after his departure, Salerno continued his pattern of bad-faith conduct to the point of impeding Sport-BLX's continued existence as a business.

74.     Throughout 2020 and 2021, following Salerno's refusal to provide Cypress's ownership information, and despite the disruptions caused by the COVID-19 pandemic, Sport-BLX worked tirelessly to develop a new business model and sought to maximize the company's value for shareholders.  Specifically, Sport-BLX planned to enter into a subscription agreement with a separate broker-dealer and collect revenue in the form of a technology licensing fee.

75.     Sport-BLX's alternative plan would ensure that Sport-BLX's shareholders would receive revenue—in licensing fees, rather than commissions—from the company's business. That new business model aimed to maximize returns for Sport-BLX's shareholders, including Cypress.  That would allow Sport-BLX to grow despite Salerno and Cypress exercising negative control over the company by refusing to disclose Cypress's ownership.

76.     At the same time, Sport-BLX was actively seeking partnerships with additional professional athletes.  By October 2021, in addition to negotiating to raise capital, Sport-BLX was negotiating a contract with a professional athlete in the National Basketball Association.

77.     Sport-BLX's new business plan and its athlete partnerships were key to Sport-BLX's future success.  Without the ability to receive commissions, Sport-BLX would need regular revenue (in the form of licensing fees) to cover operating expenses and generate

---

[3] Pursuant to their agreement with Cypress, Hall and De Perio voted to retain Salerno as a director at the December 23, 2019 meeting, but they were no longer the majority owners of Sport-BLX.  Salerno was not reelected by the holders of a majority of the shares.

shareholder returns.  Those licensing fees would be valuable only if Sport-BLX could attract athletes willing sell shares of their revenue streams to retail investors.

78.     Sport-BLX's plans required funding.  As a young company, Sport-BLX needed capital to cover its operating costs and to continue to develop technology for its trading platform. It would also need to fund deals with professional athletes.  Raising capital was therefore critical for Sport-BLX's success.  Efforts were underway to raise funds, and several investors expressed interest.

79.     But fundraising became impossible on account of Salerno's actions.  In an October 18, 2021 email to Hall—without any warning or explanation—Salerno falsely accused Hall of "si[phoning] money out of" Sport-BLX "for [his own] benefit."

80.     Salerno provided no basis for his allegation of misconduct.  Nor could he. Salerno was not familiar with Sport-BLX's finances after his term as director ended in December 2019.  Salerno's claim in 2021 that Hall was misusing its funds—made two years after he left Sport-BLX's board—was untrue and knowingly without basis in fact.

81.     Salerno's false accusation of financial misconduct ruined Sport-BLX's ability to continue raising capital.  Continuing to raise capital without disclosing such an accusation would have been improper, however baseless and unfounded that accusation may have been.  And as Salerno knew, disclosing that accusation would scare off potential investors.

82.     Salerno was asked multiple times to produce evidence for his accusation directly to Sport-BLX's board, but he ignored the request.  Sport-BLX's board thus had no means of addressing Salerno's allegation and assuring potential investors that the allegation was meritless.

83.     Because of Salerno's false allegation of misconduct, Sport-BLX could not raise capital.  That defeated the company's reworked business plan and future opportunities.

84.     As he had in 2019, Salerno stopped Sport-BLX's progress cold and forced Sport-BLX to abandon its business plan.

85.     Since October 2021, Sport-BLX—because of Salerno's and Cypress's conduct—has been unable to generate any revenue.

86.     Salerno and Cypress continued their pattern of bad-faith conduct by causing Cypress to file an action in New York Supreme Court in January 2022.  *See Cypress Holdings, III, L.P. v. Hall*, No. 1:22-cv-1243 (LGS), ECF No. 2-1.  The initial Complaint—which brought meritless violations of racketeering laws—repeated the baseless allegation that Hall had misused Sport-BLX funds.  Faced with the prospect of legal sanctions for its frivolous racketeering claim, Cypress dropped that claim but continues to pursue its other frivolous claims.  *See* Second Amended Complaint, *Cypress Holdings, III, L.P. v. Hall*, No. 1:22-cv-1243 (LGS), ECF No. 78.

87.     On information and belief, after filing this action, Salerno sent other Sport-BLX shareholders copies of Cypress's pleadings, which repeat the unfounded assertion that Hall "siphon[ed] money out of Sport-BLX."  *Cypress Holdings, III, L.P. v. Hall*, No. 1:22-cv-1243 (LGS), ECF No. 2-1 ¶ 25, ECF No. 17 ¶ 47.  Salerno has sought to prevent Sport-BLX from recovering from his repeated efforts to interfere with the operations and fundraising activities of the company and make false allegations of financial impropriety.

**FIRST CAUSE OF ACTION**
**Violation of Section 10(b) of the Securities Exchange Act of 1934**
**and Rule 10b-5 (17 C.F.R. § 240.10b-5)**
**(against Salerno and Cypress)**

88.    Sport-BLX repeats and realleges the allegations in paragraphs 1 through 87 as though set forth fully herein.

89.    17 C.F.R. § 240.10b-5 ("Rule 10b-5") makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national security exchange, (1) [t]o employ any device, scheme, or artifice to defraud, (2) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

90.    To state a claim for a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).

91.     Salerno made materially false and misleading statements and omissions to Sport-BLX, including, but not limited to, (i) his February 2019 statement that Cypress was "my holding company," (ii) his February 2019 changes to the Side Letter that defined Cypress as "Salerno" and (iii) his August 2019 statement that his refusal to disclose Cypress's ownership was based on concerns about his "estate plan."

92.     Salerno's false and deceptive statements and acts—including, but not limited to, his representations about the nature of Cypress's structure and his failure to disclose Cypress's 18 limited partners—were materially false and misleading statements and omissions.  Had Sport-BLX known the true identities of Cypress's ownership, it would not have agreed to permit Cypress's purchase of Sport-BLX shares.  Among other reasons, as a new enterprise in a regulated industry, the identities of Sport-BLX's potential investors were crucial information for Sport-BLX.  The prospect of an upstream Sport-BLX investor with a criminal history could have jeopardized, among other things, Sport-BLX's ability to raise capital and obtain regulatory approval in the future.  Additionally, the fact that several Cypress investors had filed an investment-related lawsuit *only weeks* beforehand would have created an additional unneeded risk for Sport-BLX.

93.     Salerno knew that his statements regarding Cypress's ownership were false.  As the managing partner of Cypress, he knew the identities of all of Cypress's limited partners, as demonstrated by his eventual disclosure of their identities in response to a Court order.  Salerno intended that his false statements about Cypress's ownership would deceive Sport-BLX into agreeing to sell Sport-BLX shares to Cypress, and intended that Sport-BLX would rely on his materially false and misleading statements and omissions about Cypress.

94.     Salerno made those false representations in connection with the sale of Sport-

BLX securities.

95.     Sport-BLX relied on Salerno's material misrepresentations.  As Cypress's managing partner, Salerno had superior information about Cypress's ownership and structure. Sport-BLX relied on Salerno to make truthful representations about Cypress.

96.     Salerno's false representations have caused Sport-BLX to incur economic losses. As a direct result of Salerno's false representations concerning Cypress's ownership, Sport-BLX has suffered, and continues to suffer, monetary damages stemming from, among other things, its inability to carry out its business plan; out-of-pocket costs associated with developing Sport-BLX; opportunity costs associated with Sport-BLX's lost opportunities to pursue other potentially viable business plans; its inability to raise much-needed capital; and loss of goodwill.

## SECOND CAUSE OF ACTION
### Fraud
### (against Salerno)

97.     Sport-BLX repeats and realleges the allegations in paragraphs 1 through 96 as though set forth fully herein.

98.     Salerno made false and misleading statements and omissions to Sport-BLX, including, but not limited to, (i) his February 2019 statement that Cypress was "my holding company," (ii) his February 2019 changes to the Side Letter that defined Cypress as "Salerno" as and (iii) his August 2019 statement that his refusal to disclose Cypress's ownership was based on concerns about his "estate plan."

99.     Salerno knew that his statements about Cypress were false and misleading.  As the managing partner of Cypress, he knew the identities of all of Cypress's limited partners, as demonstrated by, among other things, his eventual disclosure of their identities in response to a Court order.

100.    Salerno made false and misleading statements about Cypress in order for Cypress to be able to purchase stock in Sport-BLX, and these statements were thus intended to induce Sport-BLX's reliance on those misrepresentations.

101.    Sport-BLX justifiably relied on Salerno's false and misleading statements about Cypress.  As Cypress's managing partner, Salerno had superior information about Cypress's ownership and structure.  Sport-BLX relied on Salerno to make truthful representations about Cypress.

102.    Salerno's statements about Cypress's ownership were material and essential.  Had Sport-BLX known the truth about Cypress—including the true identities of Cypress's ownership—it would not have agreed to permit Cypress's purchase of Sport-BLX shares. Among other reasons, as a new enterprise in a regulated industry, the identities of Sport-BLX's potential investors—including those investors' beneficial owners—were crucial information for Sport-BLX.  Additionally, Salerno's false and misleading statements about Cypress's ownership in August 2019 prevented Sport-BLX from developing strategies that would have allowed to pursue its original business plan.

103.    Salerno's false representations have caused Sport-BLX to incur substantial damages.  As a direct result of Salerno's false representations concerning Cypress, Sport-BLX has suffered, and continues to suffer, monetary damages stemming from, among other things: its inability to carry out its business plan; out-of-pocket costs associated with developing Sport-BLX; opportunity costs associated with Sport-BLX's lost opportunities to pursue other potentially viable business plans; its inability to raise much-needed capital; and loss of goodwill.

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(against Salerno and Cypress)**

104.     Sport-BLX repeats and realleges the allegations in paragraphs 1 through 103 as
though set forth fully herein.

105.     Salerno owed fiduciary duties to Sport-BLX as a director.  Those duties included,
among other things, the duty of loyalty, which mandated that the best interests of Sport-BLX and
its shareholders take precedent over any interest of Salerno's.  Those duties also include the duty
of care, which required Salerno to exercise due care in decision-making and to act on an
informed basis.

106.     Salerno breached his fiduciary duty of loyalty by engaging in a pattern of seeking
personal gain at the expense of Sport-BLX, including but not limited to refusing to disclose
Cypress's ownership information based on personal interests.

107.     Salerno breached his fiduciary duty of care by acting with reckless indifference or
a deliberate disregard of Sport-BLX's shareholders, including but not limited to failing to inform
himself of Sport-BLX's business activities and failing to exercise informed judgment in making
decisions about Sport-BLX.

108.     Cypress owed fiduciary duties to Sport-BLX as its shareholder.  Although it was
not a majority shareholder, Cypress's failure to disclose its beneficial ownership in Sport-BLX's
application to FINRA acted as an effective veto on Sport-BLX's ability to register as a broker-
dealer with FINRA and sell securities to retail investors.  Cypress exercised that veto in refusing
to provide that information after repeated requests from Sport-BLX's board.

109.    As a result of those acts and omission, among others, Cypress thus possessed actual control over Sport-BLX with respect to Sport-BLX's ability to obtain FINRA registration and pursue its business model.  That actual control gave rise to Cypress's fiduciary duties.

110.    Cypress breached its fiduciary duties by engaging in a pattern of seeking personal gain at the expense of Sport-BLX, including but not limited to refusing to disclose its ownership as part of Sport-BLX's FINRA application.

111.    Salerno's and Cypress's conduct was the proximate cause for Sport-BLX's decision to abandon its original business model and carry out necessary fundraising efforts. Sport-BLX has thus been unable to generate revenue, pursue potentially lucrative business opportunities, or raise capital.

112.    As a result of Salerno's and Cypress's conduct, Sport-BLX has suffered, and continues to suffer, monetary damages.  It has also suffered loss of goodwill because of the reputational damage caused by Salerno's and Cypress's conduct.

## FOURTH CAUSE OF ACTION
### Tortious Interference with Prospective Economic Advantage
### (against Salerno and Cypress)

113.    Sport-BLX repeats and realleges the allegations in paragraphs 1 through 112 as though set forth fully herein.

114.    Until the actions of Defendants, Sport-BLX had a reasonable probability of a business opportunity.  Among other things, Sport-BLX had begun negotiating with potential athlete-partners and outside advertising firms.  Sport-BLX had also discussed its business opportunity with potential investors.  Those negotiations and discussions amounted to relations that would have led to potentially profitable contracts for Sport-BLX, and thus gave rise to a bona fide expectancy of future economic advantage for Sport-BLX.

115.    The Defendants intentionally interfered with Sport-BLX's reasonably likely business opportunity.  Among other acts and omissions, the Defendants refused to provide ownership information in response to Sport-BLX's FINRA application, which frustrated Sport-BLX's ability to consummate its business relationships and enter into potentially profitable contracts based on its initial business plan.

116.    Additionally, Salerno and Cypress threatened Sport-BLX with litigation, then made frivolous and unsupported accusations that Sport-BLX's founder had engaged in misconduct with Sport-BLX's funds.  Salerno and Cypress knew that those threats and false statements would hinder Sport-BLX's ability to consummate its prospective business relationships, including, among other things, Sport-BLX's athlete partnerships, its agreements with advertising firms, and its ability to obtain outside investment.  Salerno's and Cypress's conduct thus amounted to intentional interference with those business relationships.

117.    The Defendants' conduct proximately caused harm to Sport-BLX.  As a result of their conduct, Sport-BLX has suffered, and continues to suffer, monetary damages stemming from its inability to raise much-needed capital, which left it unable to carry out its business plan. It has also suffered loss of goodwill because of the reputational damage caused by the Defendants' conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Sport-BLX prays that the Court enters judgment in its favor and against the Defendants for the following relief:

a)    an award of compensatory damages, incidental damages, punitive damages, and consequential damages;

b)      an award of such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

c)      an award of reasonable attorneys' fees, costs and expenses of this action; and

d)      such other and further relief as the Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Sport-BLX demands a trial by jury on all issues so triable.

Dated: March 1, 2023
         New York, New York

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.

By:      */s/ Jonathan S. Sack*
          Jonathan S. Sack
          Edward M. Spiro
          W. Alex Harris
565 Fifth Avenue
New York, New York 10017
(212) 856-9600 (phone)
(212) 856-9494 (fax)
jsack@maglaw.com

Wylie M. Stecklow
Wylie Stecklow PLLC
Carnegie Hall Tower
152 W. 57th Street
Ste 8th Floor
New York, New York 10019
(212) 566-8000 (phone)
(212) 202-4952 (fax)
wylie@wylielaw.com

Remy Green
Cohen&Green P.L.L.C.
1639 Centre Street, Ste. 216
Ridgewood, New York 11385
(929) 888-9480 (phone)
(929) 888-9457 (fax)
remy@femmelaw.com

*Attorneys for Plaintiff Sport-BLX, Inc.*